UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| JAVON MIGUEL, | Case No. 2:18-cv-02111-RFB-BNW |
| Petitioner, | **ORDER** |
| v. | |
| JERRY HOWELL, *et al.,* | |
| Respondents. | |

## I.    <u>INTRODUCTION</u>

In 2014, a jury convicted Javon Miguel ("Petitioner" or "Miguel"), a former Nevada prisoner,[1] of (1) Pandering of a Child; (2) First-Degree Kidnapping; and (3) Pandering by Furnishing Transportation. (ECF No. 14-10.) This matter is before the Court on the remaining grounds of Miguel's <u>Pro Se</u> Petition for Writ of Habeas Copus under 28 U.S.C. § 2254 (ECF No. 4) ("Petition"). The Court denies the Petition and denies a Certificate of Appealability.

## II.    <u>BACKGROUND</u>[2]

The complaining victim, A.B.,[3] testified she engaged in prostitution at least twice in Hesperia, California when she was 13 years old, but her pimp kept the money. (ECF No. 12-1 at 67–69, 106–107.) When she was 14 years old she, and her grandparents who were her legal

---

[1] Miguel initiated this habeas proceeding while he was incarcerated. (ECF No. 1.) He was released on parole on January 30, 2019. (ECF No. 21.)

[2] The Court makes no credibility findings or other factual findings regarding the truth or falsity of evidence or statements of fact in the state court. The Court summarizes the same solely as background to the issues presented in this case and does not summarize all such material. No assertion of fact made in describing statements, testimony, or other evidence in the state court constitutes a finding by this Court. Any absence of mention of a specific piece of evidence or category of evidence does not signify the Court overlooked the evidence in considering the claims.

[3] The Local Rules of Practice state: "[p]arties must refrain from including—or must partially redact, where inclusion is necessary—[certain] personal-data identifiers from all documents filed with the court, including exhibits, whether filed electronically or in paper, unless the court orders otherwise." LR IA 6-1(a). As this includes the names of minor children, only a child's initials should be used. <u>Id.</u> The witness referred to here as "A.B." was a minor at the time the events occurred.

guardians, moved to Apple Valley, which is near Victorville, California. (Id. at 39–40, 57–59, 69.) Thereafter, A.B. met a man in Victorville called "Papa John" who, during a discussion about prostitution, told her about his brother Miguel. (ECF No. 13-1 at 31–35.)

A.B. testified that on August 24, 2012, while she was 14 years old, her grandfather dropped her off at a park in Victorville where she encountered Miguel when she and her girlfriend entered a nearby store. (ECF No. 12-1 at 61–63.) Miguel asked for her name and they ended up hanging out at the park with their friends. (ECF Nos. 12-1 at 61–66, 99–100; 13-1 at 28–29.) A.B. said Miguel confirmed Papa John was his brother and she informed Miguel she previously prostituted. (ECF Nos. 12-1 at 66–68; 13-1 at 33.) A.B believed her disclosure led to Miguel's statements that he was "hanging out making money," doing "prostitution," and had "girls who work for him and make money for him." (ECF Nos. 12-1 at 66–67; 13-1 at 36–38.) A.B. testified she believed Miguel was a pimp because of "his personality;" his "real fancy," "nice—proper," clothes; and because he displayed a wad of cash. (ECF No. 12-1 at 69–70, 102–04.) A.B. said Miguel did not dress like a stereotypical pimp as portrayed on television, but instead wore a "nice shirt," "blackish jeans," and a watch. (Id.) A.B. did not know whether or not Miguel's wad of cash consisted merely of a $20 bill wrapped around $1 bills. (Id.) A.B. also testified that Miguel never came right out and told her he was a pimp; rather, she "kind of all put it together" and thought he "must have girls working for [him]," based on her belief that he "was a player," "makes money," and has "a lot of females." (ECF Nos. 12-1 at 104; 13-1 at 35–38.)

A.B. testified while they were at the park, Miguel asked her age, and she falsely told him she was 18 years old. (ECF No. 12-1 at 70.) And when Miguel asked for her identification, she had none. (ECF No. 13-1 at 22, 39.) She told Miguel she lived with her grandparents but did not tell him they were her legal guardians. (Id. at 40.) A.B. said Miguel told her she could "get a fake ID" they could "get an apartment together," and she would make money. (ECF No. 12-1 at 70.)

A.B. testified that Miguel told her she could work with him as a prostitute if she wanted to, but she did not have to if she did not want to, and he did not force, trick, or use threats, to get her to do so. (ECF No. 12-1 at 70, 108, 112–13.) Miguel provided A.B. with his phone number written on a business card. (Id. at 70, 72–73.) A.B. testified Miguel never said he wished to date her; rather,

her impression was he wanted to "make money" through her "work," by which she believed he meant "prostitution." (ECF No. 13-1 at 38–39.)

A.B. said she told Miguel she was interested in working as a prostitute with him and they agreed to meet at his house the next day. (ECF No. 12-1 at 73.) When Miguel told A.B. he was going to Las Vegas to see his friend, Punchy, who was staying at the Golden Nugget, she agreed to go with him. (ECF Nos. 12-1 at 109–10; 13-1 at 23.) A.B. said when her grandfather dropped her off at Miguel's house the following day, she knew they were going to Las Vegas for her to work as a prostitute, so when Miguel asked if she wanted to go to "make money and go to Vegas," and if she wanted to "go find work," she told him "yes," believing he meant she would go with him to "prostitute" in Las Vegas. (ECF No. 12-1 at 74–75, 114–15.) Miguel's brother-in-law, Terrell Timothy Parker, testified he was present at Miguel's home the night Miguel and A.B. left together for Las Vegas. (ECF No. 13-2 at 30–31.) A.B.'s grandfather, Daniel Heimbecher, testified he filed a missing person report with police when A.B. did not call or come home. (ECF No. 13-1 at 49–51, 54–55.) Heimbecher identified A.B.'s birth certificate, which verified she was 14 years old at the time of the Las Vegas trip with Miguel. (Id. at 52–54.) Heimbecher never met Miguel before this case and never gave him permission to prostitute A.B. or take her to Las Vegas. (Id.)

A.B. agreed to prostitution because she was tired of not having money of her own. (ECF Nos. 12-1 at 109–10; 13-1 at 44.) She said she would never have agreed to prostitute if Miguel had not told her he would help her make money at it; and she would not have gone to Las Vegas if he had not suggested it and agreed to pimp her. (ECF No. 13-1 at 43–45.) She said Miguel did not force or trick her into going to Las Vegas; did not threaten or coerce her to go; and did not lock her in a car or room. (ECF No. 12-1 at 111–13.)

According to A.B., Miguel drove them to Las Vegas in his "old-looking" burgundy-colored car. (ECF No. 12-1 at 75.) She said that, during the drive, Miguel told her she would be "making money in Vegas" prostituting and assured her that he would walk behind her, so nothing happened to her. (Id. at 76–77.) She said he told her to look for clients "with like a lot of money, like nice cars." (ECF Nos. 12-1 at 121; 13-1 at 41.) She said he instructed her to charge no less than $100; and they agreed to split the proceeds fifty-fifty. (ECF No. 12-1 at 77–79.) She said he instructed

her to give the proceeds to him, and he would return her portion to her. (Id.) She said Miguel gave her condoms "[f]or protection" on "dates," which she explained meant a client "wants to have sex with you for money." (Id.) She said he instructed her not to have sex with a client who refused to use a condom. (Id. at 80.) She said he told her to ignore "black males" "[b]ecause they will try to make you their prostitute," and never "look them in the eye" or speak to them. (Id.) She said he told her she could have sex in his car, or in a motel at his expense. (ECF No. 13-1 at 41–42.) She said he told her, after Las Vegas, they would go where there was money. (Id. at 45.)

A.B. testified they arrived in Las Vegas in the early morning of August 25, 2012, and ate at a McDonald's near the Stratosphere as A.B. had not eaten since her arrival at Miguel's house. (ECF No. 12-1 at 80–82.) She said after they ate, Miguel told her to "get down what I was supposed to do," meaning prostitute, to earn "gas money" for the return trip to Victorville. (Id. at 81–82.) She said she walked down Las Vegas Boulevard to the Stratosphere with Miguel trailing behind her. (Id. at 82–83.) She said she occasionally looked back to ensure he was watching her because she would have been "mad" and "scared" if he was not. (Id. at 82–84.) She said Miguel never asked her to initiate conversations with men and never introduced her to men. (Id. at 121–22.) Although four men approached her about sex in exchange for money, no deals were struck, and after two hours her feet hurt so they went to rest in Punchy's hotel room at the Golden Nugget. (Id. at 84–85.) A.B. said they rested in Punchy's hotel room until they returned to the Stratosphere area later that night, where A.B. once again walked the strip while Miguel walked behind her. (ECF No. 12-1 at 85–88.) She said this time three men approached her about sex or doing drugs in exchange for money, but no deals were struck. (Id.) She engaged in no sexual conduct based on her walks on the strip, and around 4:00 a.m., they were ready to return to California, as planned, and Miguel told her he would meet her at his car. (ECF Nos. 12-1 at 87–88, 116, 121; 13-1 at 42.)

Officers Erik Perkett and Andrew Keller, of the Las Vegas Metropolitan Police Department ("Metro"), testified they stopped A.B. around 4:00 a.m., near the Stratosphere, in an area locals call "the Naked City." (ECF No. 11-1 at 28–31, 35, 64–67.) The officers stopped her because she was jaywalking; but as they approached, they noticed she was wearing "provocative" clothes and appeared "about 12 to 13 years old." (Id. at 31–33, 46–47, 68.) According to both officers, A.B.

spontaneously told them she was "not a prostitute." (<u>Id.</u> at 46–47, 67.) A.B. told the officers she was 18 years old, gave them a phony birthdate in 1993 that placed her at 19 years old, and said she was meeting her "boyfriend" or "friend" at his red or maroon four-door sedan. (ECF Nos. 11-1 at 31–33, 69–70; 12-1 at 88–90.) The officers told A.B. that giving false information to an officer is against the law, but she maintained she was 18 years old. (ECF No. 11-1 at 48.) The officers confirmed, through the California Department of Motor Vehicles, that A.B. was from California and only 14 years old. (<u>Id.</u> at 33, 50, 69.) When the officers confronted A.B. with the information, she admitted she was only 14 years old. (<u>Id.</u>) Based on A.B.'s age, clothes, statements, and the area, Keller called vice detectives to investigate prostitution. (<u>Id.</u> at 49, 51.)

Officers Perkett and Keller noticed Miguel and a woman watching from a distance. (ECF No. 11-1 at 34–35, 38, 62, 70–71.) Perkett peered at them using binoculars, and they started walking away. (<u>Id.</u>) Keller said the woman was dressed in the "seductive style" of a prostitute, and although people wear provocative clothing to all-night clubs on the strip, such as the Stratosphere nightclub, he detected nothing indicating she was clubbing when he spoke to her.[4] (<u>Id.</u> at 73, 77, 80.) Based on their knowledge that pimps and prostitutes maintain proximity, the officers believed the couple were "involved with [A.B.] being a prostitute," and Miguel might be a "pimp," for both females, so they stopped them to investigate. (<u>Id.</u> at 39, 58–59, 74–75.)

Miguel identified himself with a California driver's license; told them A.B. was his girlfriend and he was concerned about her; and permitted the officers to search his vehicle, which matched A.B.'s description of her boyfriend's car. (ECF No. 11-1 at 39–41, 51–53, 57, 71–72, 76.) The officers found no contraband in Miguel's car. (<u>Id.</u>) Officer Keller thought Miguel lied when he told them he was walking to his car because Keller saw Miguel walking away from his car. (<u>Id.</u> at 80.) Officer Perkett believed Miguel was A.B.'s "boyfriend" because they each said so. (<u>Id.</u> at 52, 57.) Police did not arrest Miguel for any crimes, but they arrested A.B. for "jaywalking, curfew violations and providing false information to a police officer." (<u>Id.</u> at 42, 56.) Metro found a business card and three condoms in A.B.'s possession. (<u>Id.</u> at 43–44, 53–54.)

---

[4] The woman was arrested on an outstanding warrant, but not for prostitution although she had a previous arrest for prostitution. (ECF No. 11-1 at 41, 56, 63, 77–81, 96–97.)

Metro Vice Detective William Van Cleef testified he spoke with A.B. at juvenile hall and contacted A.B.'s grandparents, who collected her and returned to California. (ECF Nos. 11-1 at 109, 121; 12-1 at 2.) Van Cleef determined Miguel was the sole subscriber for the phone number on the business card found in A.B.'s possession. (ECF No. 11-1 at 122–23.) Van Cleef later contacted A.B. by telephone, and although initially reluctant to talk about prostitution, A.B. eventually gave a taped interview to Detectives Van Cleef and Rochelle Zerbe at A.B.'s home in California. (ECF No. 12-1 at 3–4, 16–17, 25–26.) Van Cleef testified, in his experience, "nine times out of ten" a juvenile victim is too fearful to talk to police if their pimp is nearby. (Id. at 24–25.) Van Cleef explained pimps have rules which include "checking in before or after time with a potential client of prostitution," "how much to charge," "who and where acts" will occur, and whom "to talk to because they're in fear of that girl maybe choosing up another pimp," and to avoid talking to a specific type of person whom the pimp suspects is a "police officer" or "bum." (ECF No. 11-1 at 116–18.) Van Cleef said that, in his experience, pimps collect 100% of the earnings and the victim prostitute is never paid the agreed share even where a victim prostitute is under the impression the pimp holds the victim's money until he or she wants it. (Id.)

Miguel unsuccessfully challenged his convictions on state direct appeal and state post-conviction review. (ECF Nos. 19-3; 20-9.)

### III.    GOVERNING LEGAL STANDARDS

If a state court has adjudicated a habeas corpus claim on its merits, a federal court may only grant habeas relief with respect to that claim if the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established [f]ederal law, as determined by the Supreme Court of the United States[;]" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

A state court's decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254(d)(1), "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless

arrives at a result different from [Supreme Court] precedent." <u>Lockyer v. Andrade</u>, 538 U.S. 63, 73 (2003) (quoting <u>Williams v. Taylor</u>, 529 U.S. 362, 405–06 (2000), and citing <u>Bell v. Cone</u>, 535 U.S. 685, 694 (2002)). A state court's decision is an unreasonable application of clearly established Supreme Court precedent within the meaning of 28 U.S.C. § 2254(d)(1) "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." <u>Lockyer</u>, 538 U.S. at 75 (quoting <u>Williams</u>, 529 U.S. at 413). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous . . . [rather] [t]he state court's application of clearly established law must be objectively unreasonable." <u>Lockyer</u>, 538 U.S. at 75 (quoting <u>Williams</u>, 529 U.S. at 409–10, 412) (internal citation omitted). State courts are not required to be aware of or cite Supreme Court cases, "so long as neither the reasoning nor the result of the state-court decision contradicts them." <u>Early v. Packer</u>, 537 U.S. 3, 8 (2002). "State-court decisions are measured against [the Supreme Court]'s precedents as of 'the time the state court renders its decision.'" <u>Cullen v. Pinholster</u>, 563 U.S. 170, 182 (2011) (quoting <u>Lockyer</u>, 538 U.S. at 71–72).

"[A] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." <u>Harrington v. Richter</u>, 562 U.S. 86, 101 (2011) (citing <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664 (2004)). "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." <u>Harrington</u>, 562 U.S. at 102 (citing <u>Lockyer</u>, 538 U.S. at 75); <u>see also Cullen</u>, 563 U.S. at 181 (stating the standard is a "difficult-to-meet" and "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt") (internal quotation marks and citations omitted). Petitioners have the burden of proof. <u>See Cullen</u>, 563 U.S. at 181 (citing <u>Woodford v. Visciotti</u>, 537 U.S. 19, 25 (2002)).

**IV.    DISCUSSION**

**A.    Ground 2—Sufficiency of the Evidence**

In Ground 2, Miguel claims there was insufficient evidence to support his convictions for (A) Pandering and (B) First-Degree Kidnapping, in violation of his Fifth and Fourteenth Amendment rights to due process. (ECF No. 4 at 5–6.) For the reasons discussed below, Ground

2 is denied because the state appellate court's determinations rejecting these claims are neither contrary to nor constitute an unreasonable application of clearly established Supreme Court authority and are not based on an unreasonable determination of fact.

### 1.    Applicable Legal Principles

A federal habeas petitioner faces a "considerable hurdle" when challenging the sufficiency of evidence to support his conviction. Davis v. Woodford, 384 F.3d 628, 639 (9th Cir. 2004). According to the Supreme Court, a jury's verdict must stand if, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See id. (citing Jackson v. Virginia, 443 U.S. 307, 319 (1979).) A reviewing court, when faced with a record of historical facts that supports conflicting inferences, must presume that the trier of fact resolved any such conflicts in favor of the prosecution and defer to that resolution, even if the resolution of specific conflicts by the state court trier of fact does not affirmatively appear in the record. See id. (citing Jackson, 443 U.S. at 326.) The Jackson standard is applied with reference to the substantive elements of the criminal offense as defined by state law. See id. (citing Jackson, 443 U.S. at 324 & n.16.) When the deferential standards of AEDPA and Jackson are applied together, the question on federal habeas review is whether the state court unreasonably applied the Jackson standard to the evidence at trial. See e.g., Juan H. v. Allen, 408 F.3d 1262, 1274–75 (9th Cir. 2005) (citations omitted).

Where circumstantial evidence is used to establish guilt, the Supreme Court has held that it is "intrinsically no different from testimonial evidence" because although "circumstantial evidence may in some cases point to a wholly incorrect result" this is "equally true of testimonial evidence." Holland v. United States, 348 U.S. 121, 140 (1954) (rejecting contention that circumstantial evidence must exclude every hypothesis but that of guilt). "In both instances, a jury is asked to weigh the chances that the evidence correctly points to guilt against the possibility of inaccuracy or ambiguous inference," and "[t]he jury must use its experience with people and events in weighing the probabilities." Id. "If the jury is convinced beyond a reasonable doubt, [the Supreme Court requires] no more." Id; see also Jackson, 443 U.S. at 324–26 (finding circumstantial evidence sufficient to prove specific intent to kill).

## 2.    The State Court's Determination

The state appellate court rejected Miguel's insufficiency of evidence claims as follows:

> Appellant Javon Miguel claims insufficient evidence supports his convictions for pandering of a child and first-degree kidnapping. He specifically asserts that the State did not present sufficient evidence to prove he inveigled, enticed, or compelled A.B. to become a prostitute or to continue to engage in prostitution and the State did not present sufficient evidence of his subjective intent at the time of the alleged acts to support the conviction for kidnapping.

> When reviewing a challenge to the sufficiency of the evidence, we review the evidence in the light most favorable to the prosecution and determine whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); Mitchell v. State, 124 Nev. 807, 816, 192 P.3d 721, 727 (2008). "[I]t is the function of the jury, not the appellate court, to weigh the evidence and pass upon the credibility of the witness." Walker v. State, 91 Nev. 724, 726, 542 P.2d 438, 439 (1975). And circumstantial evidence is enough to support a conviction. Lisle v. State, 113 Nev. 679, 691–92, 941 P.2d 459, 467–68 (1997), holding limited on other grounds by Middleton v. State, 114 Nev. 1089, 1117 n.9, 968 P.2d 296, 315 n.9 (1998).

> A.B. testified she met Miguel at a park in Victorville, California. When A.B. asked Miguel what he was doing at the park, he responded that he was "just hanging out making money." A.B. believed that Miguel was a pimp based on Miguel's personality, the way he was dressed, and the amount of money he had. After disclosing to Miguel that she had previously engaged in prostitution, Miguel told her he made money doing prostitution and explained that he has girls who work for him and make money for him. Miguel told A.B. that if she wanted to work for him, she could and if she did not want to she did not have to. Miguel gave A.B. a business card with his phone number written on it and said she could call him if she wanted to work for him. If she worked for him, Miguel said they could get an apartment, she could get a fake identification card, and she would make some money. A.B. responded that she was interested in working with him as a prostitute and arranged to meet Miguel the next day. Although A.B. was only 14 years old at the time, she told Miguel that she was 18 years old. She also told Miguel that she lived with her grandparents.

> The following day, A.B. went to Miguel's home. Miguel asked A.B. if she wanted to make some money and go to Las Vegas. A.B. agreed and she and Miguel drove to Las Vegas later that day. While driving to Las Vegas Miguel and A.B. discussed A.B. making money working as a prostitute. Miguel said he would walk a short distance from her so he could watch her and make sure that nothing happened to her, A.B. was to charge no less than $100, and they would split the money she earned fifty-fifty. Miguel also told A.B. not to talk to black males because they would try to make her their

prostitute. A.B. was also to avoid eye contact with black males. Miguel gave A.B. condoms and his phone number. Miguel advised A.B. that the condoms were for her protection when she goes on "dates" and told her if her "date" did not want to use a condom she could not have sex with him.

After arriving in Las Vegas, Miguel took A.B. to a McDonald's near the Stratosphere. A.B. walked between the McDonald's and the Stratosphere for approximately two hours. Although Miguel did not point out people for A.B. to approach, he did tell her to look for men with a lot of money, i.e. men who drove nice cars. Miguel told A.B. that if she got a "date" she should take the "date" to either a hotel room, which Miguel would pay for, or take him to Miguel's car to perform the sex act. During the two hour period, A.B. was approached by four men, but she did not engage in sex with any of them. Miguel then took A.B. to his friend's hotel room, where he and A.B. rested for a while. Sometime later, Miguel and A.B. returned to the same area near the Stratosphere, where A.B. again walked the area looking for "dates." This time A.B. was approached by three men. She did not engage in sex with any of them. At approximately 4:00 a.m., A.B. was walking to Miguel's car when she was stopped by jaywalking and because the officers believed she was approximately 12 or 13 years old and out past curfew. A.B. was taken into custody and her grandfather, who is her guardian, was called to retrieve her. The property on A.B. at the time of her arrest included three condoms and a business card with Miguel's phone number written on it.

A.B. testified that she would not have agreed to work as a prostitute if Miguel had not told her he would help her make money and she would not have gone to Las Vegas to prostitute herself if Miguel had not suggested it.

A.B.'s grandfather testified that he did not know Miguel, did not give Miguel permission to take A.B. anywhere, and did not give Miguel permission to prostitute A.B. He further testified that when A.B. did not return home he filed a missing person's report with the police.

The jury could reasonably infer from the evidence presented that Miguel willfully induced, persuaded, encouraged, or enticed A.B., who was a child under the age of 18, to become a prostitute or to continue to engage in prostitution, see 2013 Nev. Stat., ch. 426, § 42, at 2430–31, and that Miguel led, took, enticed, or carried away A.B., a minor, with the intent to keep or confine her from her parents or guardians, or with the intent to hold A.B. to unlawful service, see NRS 200.310(1). It is for the jury to determine the weight and credibility to give conflicting testimony, and the jury's verdict will not be disturbed on appeal where, as here, substantial evidence supports the verdict. See Bolden v. State, 97 Nev. 71, 73, 624 P.2d 20, 20 (1981); see also McNair v. State, 108 Nev. 53, 56, 825 P.2d 571, 573 (1992).

(ECF No. 19-3.)

### 3.      Ground 2(A)—Pandering

At the relevant time, Nevada defined pandering as: "[a] person who[] [i]nduces, persuades, encourages, inveigles, entices, or compels a person to become a prostitute or to continue to engage in prostitution." NRS § 201.300(1)(a), as amended by 1997 Laws, p. 295. See also ECF No. 14-1 at 4, 7–17. "[T]o be convicted of pandering under NRS § 201.300(1)(a), a defendant must act with the specific intent of inducing (or persuading, encouraging, inveigling, enticing, or compelling) his target to become or remain a prostitute." Ford v. State, 127 Nev. 608, 613–14, 262 P.3d 1123, 1126–27 (2011). "Success is not a necessary component of the crime . . . [i]t is the act of encouragement, persuasion or inveiglement which is forbidden." Id. at 623–24 (citations omitted). At the time of Miguel's trial, the testimony of a victim or targeted person need not be supported by corroboration because the statute requiring corroboration was repealed in 2005. See id. at 616 (citations omitted). At the relevant time, the term "prostitution" meant "engaging in sexual conduct for a fee," and the term "prostitute" was defined as "a male or female person who for a fee engages in sexual intercourse, oral-genital contact or any touching of the sexual organs or other intimate parts of a person for the purpose of arousing or gratifying the sexual desire of either person." NRS § 201.295, as amended by 2009 Laws, c. 160 § 5.

In Miguel's case, corroboration of A.B.'s testimony was not necessary and there was ample evidence upon which a rational jury could infer that Miguel, with the specific intent that A.B. do so, induced, persuaded, encouraged, inveigled, enticed, or compelled A.B. to become a prostitute or continue to engage in prostitution, i.e., for a fee, engage in sexual intercourse, oral-genital contact, or touching of the sexual organs or other intimate parts of a person for the purposes of arousing or gratifying the sexual desire of either person.

A.B. testified that, during her conversation with Miguel at the park, she got the distinct impression he was a "pimp" based on his dress, manner, and clothes.[5] She testified that, after she told him she had prostitution experience, he told her she could work for him. She testified he told her she could get a fake ID, they could get an apartment, and she could make money. He gave her

---

[5] "A 'pimp' solicits patrons for the prostitute and lives off her earnings, while a 'panderer' recruits prostitutes and sets them up in business." Ford, 127 Nev. at 616 (quotation marks and citations omitted.)

his phone number and agreed to take her with him to work in Las Vegas if she came to his house the next day. A.B. testified she never would have agreed to return to prostitution, or gone to Las Vegas with Miguel, had he not convinced her she could make money as a prostitute with him and offered to "pimp" her. See text, supra, at 2–5. During the drive to Las Vegas, Miguel told A.B. that he would protect her from dangerous clients by walking near or behind her on the strip in Las Vegas while she trolled for clients, with whom she could perform sex in exchange for money; and instructed her that (1) she was to charge a $100 fee for engaging in sex with "dates"; (2) she would split the money she earned with him on a fifty-fifty basis; (3) she would give him all of the money she earned and he would return her share to her; (4) she was to look for "dates" that appear to have a lot of money and look like they drive nice cars; (5) she was to avoid certain types of individuals; and (6) she could have sex with her "dates" in Miguel's vehicle or in a motel room at Miguel's expense. See text, supra, at 3–4. Upon arrival in Las Vegas, Miguel directed A.B. to "get down what" she was supposed to do and prostitute for a few hours for gas money, and then he followed her for protection as she walked the strip and discussed the price of sex with potential clients. And, despite that initial unsuccessful walk down the strip, Miguel returned her to walk the strip a second time while again walking behind her for her protection. See text, supra, at 4–5. Given the evidence at trial, the state appellate court reasonably determined a rational jury could conclude the State proved Pandering beyond a reasonable doubt. Ground 2(A) is denied.

### 4.    Ground 2(B)—First-Degree Kidnapping

NRS § 200.310(1) defines first-degree kidnapping in Nevada, in relevant part as:

> . . . a person who leads, takes, entices, or carries away or detains any minor with the intent to keep, imprison, or confine the minor from his or her parents, guardians, or any other person having lawful custody of the minor, or with the intent to hold the minor to unlawful service, or perpetrate upon the person of the minor any unlawful act.

See Wright v. State, 94 Nev. 415, 417, 581 P.2d 442, 443 (1978) (observing NRS § 200.310(1) "is broad in its sweep.").

The State maintained Miguel was guilty of First-Degree Kidnapping based on two theories: A.B. was a minor whom Miguel led, took, enticed, or carried away or detained with the intent to

either (1) keep, imprison, or confine her from her parents or guardians; or (2) hold her to unlawful service. (ECF No. 13-2 at 50–53.)

In Miguel's case, there was evidence upon which a rational jury could determine Miguel "enticed" or "led" A.B. to go to Las Vegas with him. See text, supra, at 12–14. There was strong evidence that Miguel "took," "carried away," and "detained" A.B. when he drove her across the state line in California to Nevada and kept her from home for two nights. See text, supra, at 3–6. There was evidence upon which a rational jury could infer Miguel specifically intended to hold A.B. "to unlawful service." A.B. testified Miguel instructed her on (1) how to conduct herself as a prostitute; (2) how much money to charge and how much they would each derive from her earnings as a prostitute; and (3) how he would control the distribution of that money. See text, supra, at 3–4. He directed A.B. to "get down" and prostitute herself on the strip upon arrival in Las Vegas and returned her to walk the strip later that night. See text, supra, at 4.Van Cleef's testified Miguel's instructions and actions were consistent with the practice of panderers. See text, supra, at 6. There was evidence upon which a rational jury could infer Miguel specifically intended to keep A.B. from her parents or guardians. There was evidence upon which a rational jury could infer Miguel was aware A.B. had parents or guardians. Two police officers testified A.B. looked about 12 to 13 years old. When A.B. told Miguel she was 18 years old, he evinced doubt by requesting her identification. And when she had no identification, he told her she could get a fake one. Moreover, A.B. said she told Miguel she lived with her grandparents and her grandfather gave her a ride to Miguel's house. There was evidence upon which a rational jury could infer Miguel specifically intended to keep A.B. from her parents or guardians. Miguel had sole custody and control over A.B., kept her under his careful watch for two nights in a state away from her grandparents, told her they could get an apartment, and told her they would go where there is money after Las Vegas. See text, supra, at 2–7. The state appellate court reasonably determined a rational jury could find the State proved first-degree kidnapping beyond a reasonable doubt. Ground 2(B) is denied.

### B.   Ground 5—IAC—Concessions of Guilt in Closing Argument

In the remaining portion of Ground 5, Miguel alleges trial counsel provided ineffective assistance in closing arguments by relieving the State of its burden of proof for the conviction for

Pandering by Furnishing Transportation, when counsel (A) conceded Miguel drove A.B. to Las Vegas, Nevada and (B) conceded Miguel and A.B. agreed to make money through A.B.'s prostitution in Las Vegas. (ECF Nos. 4 at 15–19; 20-9; 29 at 5–6.) For the reasons discussed below, the remaining portion of Ground 5 is denied because the state appellate court's determinations rejecting these claims are neither contrary to nor constitute an unreasonable application of clearly established Supreme Court authority and are not based on an unreasonable determination of fact.

### 1.    Applicable Legal Principles

"[T]he Sixth Amendment does not guarantee the right to perfect counsel; it promises only the right to effective assistance . . . ." Burt v. Titlow, 571 U.S. 12, 24 (2013). An IAC claim requires a petitioner to demonstrate (1) the attorney's "representation fell below an objective standard of reasonableness[;]" and (2) the attorney's deficient performance prejudiced the petitioner such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 687–88, 694 (1984). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. "The likelihood of a different result must be substantial, not just conceivable." Harrington, 562 U.S. at 112; Cullen, 563 U.S. at 189. Petitioners bear the burden to show "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed . . . by the Sixth Amendment" and that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Strickland, 466 U.S. at 687–88. "Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable." Id.

Petitioners making an IAC claim "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." Strickland, 466 U.S. at 690. When considering an IAC claim, a court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Id. at 689. In considering IAC claims, a court is obliged to "determine whether, in light of all the circumstances, the identified acts or omissions were outside

the wide range of professionally competent assistance." Id. at 690. For deficient performance, the issue is not what counsel might have done differently but whether counsel's decisions were reasonable from his or her perspective at the time. See id. at 689–90. Strategic choices made "after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." Id. On the other hand, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Id. at 690–91. Although IAC claims are examined separately to determine whether counsel was deficient, "prejudice may result from the cumulative impact of multiple deficiencies." Boyde v. Brown, 404 F.3d 1159, 1176 (9th Cir. 2005) (quoting Cooper v. Fitzharris, 586 F.2d 1325, 1333 (9th Cir. 1978)).

"Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult" because "[t]he standards created by Strickland and § 2254(d) are both 'highly deferential,'" and when applied in tandem, "review is 'doubly so.'" Harrington, 562 U.S. at 105 (internal citations omitted); see also Cheney v. Washington, 614 F.3d 987, 995 (9th Cir. 2010) ("When a federal court reviews a state court's Strickland determination under AEDPA, both AEDPA and Strickland's deferential standards apply; hence, the Supreme Court's description of the standard as 'doubly deferential.'") (citing Yarborough v. Gentry, 540 U.S. 1, 6 (2003)).

### 2.    Additional Background

At the relevant time, the crime of pandering by furnishing transportation, stated as follows:

> A person who knowingly transports or causes to be transported, by any means of conveyance, into, through or across this state, or who aids or assists in obtaining such transportation for a person with the intent to induce, persuade, encourage, inveigle, entice or compel that person to become a prostitute or to continue to engage in prostitution is guilty of pandering.

NRS § 201.340(1), as amended by 1997 Laws, p. 297 (repealed 2013).[6]

In closing arguments to the jury, defense counsel argued the State failed to prove the union of actions and intent for Pandering by Furnishing Transportation, in part, as follows:

---

[6] Although the statute under which Miguel was convicted was repealed as of June 30, 2013, it was applicable to the offenses because they occurred in August of 2012. See text, supra, at 3.

The State has absolutely failed to prove the crime of pandering occurred . . .

Finally, the third charge that the State has brought against my client is the charge of pandering by furnishing transportation to a prostitute. Okay. We can all agree he drove [A.B.] from California to Nevada, and then he drove her around here in town. Okay. The problem is that just moving someone knowing that they're a prostitute is not enough to convict them of pandering by providing transportation. That's because the law provides a definition of what pandering by providing transportation is—or furnishing transportation. I said providing. And that person who knowingly transports or causes to be transported by any means of conveyance into or through the state or who aids or assists in obtaining such transportation for that person with the intent to induce—now here—here we go, specific intent. He has to intend one of these results before—he has to provide the transportation with the intent to induce, persuade, encourage, inveigle, entice, or compel that person to become a prostitute or to continue to engage in prostitution.

By the time—now let's think about this. They were in the park on August 23rd when they had the conversation where [A.B.] revealed to him that she was—that she had acted as a prostitute, and he said, I'm going to Las Vegas, do you want to come with me, we'll make some money. She said, yes I want to go, and she made arrangements that she would come to his house the next day to meet him so that they can go to Los Angeles—or Las Vegas; right? That was the testimony. She had her grandfather bring her to his place so that they could go to Las Vegas. At that point, ladies and gentlemen, if there was any induction—which we've already gone over; there wasn't. But any of these verbs would have already been done. She has made up her mind that that's what she's going to do. So providing transportation was not with the specific intent to induce, even though we can agree that the providing transportation happened. They had an agreement; that's all. There wasn't any persuasion, compulsion, any of that type of stuff. It was an asked and answered situation. Did the transportation take place? Yes. Does it fit under the definition of this crime? No . . . .

Javon Miguel is not guilty under any theory that the State has pled in this case . . . .

(ECF No. 13-2 at 64–66.)

The state district court held a post-conviction evidentiary hearing at which trial counsel testified he had argued in closing remarks to the jury that Miguel "transported the alleged victim in this case to Nevada" because there was no "evidence or any material to rebut the idea that [Miguel] had driven her here from California," as A.B. testified to that fact, and "Miguel had confirmed that they came here together in his car." (ECF No. 20-3 at 5.) Defense counsel noted

A.B. told police she came to Las Vegas with her boyfriend in his red sedan and Miguel admitted his car was a red sedan, so counsel said he "didn't think that there was any way to attack that factual issue and maintain any degree of credibility with the jury." (Id.) Trial counsel testified he made a conscious tactical decision to agree Miguel brought A.B. to Las Vegas in his car because he "would look like a bald face liar to the jury" if he tried to convince them of something else. (Id. at 11.) Counsel did not recall whether he had a discussion with Miguel about a "concession strategy with regard to the idea that they were coming to Nevada," but he did not "think there was really any way [for him] to say with any degree of believability that he didn't drive her here or she didn't come here with him" as "she had his business card on her with his phone number." (Id. at 6–8.)

With respect to any agreement between Miguel and A.B., trial counsel testified:

> I did not state to the jury that there was anything beyond the idea that there was an agreement that the two of them were going to come here . . . because I didn't want to go into what—any kind of agreement that may have been made or even hint that there might have been some further agreement other than they were just coming here. . . she had said she wanted to make some money or something like that, but there was never any discussion in my—at least in my closing that I remember about a—an agreement that he was going to help her make money or they were going to do something together to make money.

(Id. at 6; see also id. at 11.)

### 3.    The State Courts' Determinations

The Nevada Court of Appeals affirmed the denial of relief as follows:

> Miguel argues the district court erred by denying a claim of ineffective assistance of counsel raised in his December 12, 2014, petition. To prove ineffective assistance of counsel, a petitioner must demonstrate counsel's performance was deficient in that it fell below an objective standard of reasonableness, and resulting prejudice such that there is a reasonable probability, but for counsel's errors, the outcome of the proceedings would have been different. Strickland v. Washington, 466 U.S. 668, 687–88 (1984); Warden, Nevada State Prison v. Lyons, 100 Nev. 430, 432–33, 683 P.2d 504, 505 (1984) (adopting the test in Strickland.) Both components of the inquiry must be shown, Strickland, 466 U.S. at 697, and the petitioner must demonstrate the underlying facts by a preponderance of the evidence, Means v. State, 120 Nev. 1001, 1012, 103 P.3d 25, 33 (2004). We give deference to the district court's factual findings if supported by substantial evidence and not clearly erroneous but review the court's application of the law to

those facts de novo. <u>Lader v. Warden</u>, 121 Nev. 682, 686, 120 P.3d 1164, 1166 (2005).

Miguel argued his defense counsel was ineffective during closing arguments for improperly stating Miguel drove the victim to Nevada from California. Miguel asserted this argument amounted to conceding his guilt for pandering by furnishing transportation. Miguel failed to demonstrate his counsel's performance was deficient or resulting prejudice.

At the evidentiary hearing, Miguel's counsel testified he did not concede Miguel committed pandering by furnishing transportation. Counsel testified he had discussed the facts of the case with Miguel prior to trial. Counsel testified Miguel stated he drove the victim from California to Nevada, but that he had not induced or persuaded the victim to engage in prostitution. Counsel formulated the trial strategy based upon that discussion and gave a closing argument consistent with Miguel's statements.

The district court found counsel's testimony and closing argument demonstrated counsel did not improperly concede Miguel committed pandering. Substantial evidence supports the district court's conclusion. <u>See</u> <u>Strickland</u>, 466 U.S. at 691 (stating "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions."). In addition, the record in this case reveals that counsel specifically argued during closing arguments that the facts of this case did not meet the definition of pandering. Given the district court's findings and the record in this case, Miguel failed to demonstrate a reasonable probability of a different outcome had Miguel's counsel made a different closing argument. Therefore, we conclude the district court did not err by denying this claim.

(ECF No. 20-9.)

### 4.    Ground 5(A)—Concession Miguel drove A.B. to Las Vegas, Nevada

Miguel asserts trial counsel provided ineffective assistance by conceding Miguel's guilt for Pandering by Furnishing Transportation, when counsel argued to the jury, "we can all agree he drove [A.B.] from California to Nevada, and then he drove her around here in town." (ECF No. 4 at 17.) The trial record, however, demonstrates counsel' argument was neither deficient nor prejudicial. There was incontrovertible evidence that Miguel and A.B. agreed to go to Las Vegas together and that Miguel, and no one else, drove A.B. from California to Las Vegas, Nevada. A.B. testified she agreed to go to Las Vegas with Miguel, and that he drove her from California to Las Vegas. Miguel's brother-in-law testified he was present at Miguel's home the night Miguel and A.B. left together for Las Vegas. Two Metro police officers stopped A.B. and Miguel in Las Vegas.

The officers said A.B. and Miguel each told them they were in Las Vegas together, and the officers saw them near Miguel's car. The officers confirmed A.B. and Miguel were each from California and Miguel's phone number was found in A.B.'s possession when she was booked into the juvenile hall. A.B.'s grandfather testified he did not give Miguel permission to take A.B. to Nevada. See text, supra, at 3–6. Based on this evidence, the state appellate court reasonably determined Miguel was not prejudiced by counsel's concession that Miguel drove the victim to Las Vegas because there is no reasonable probability that refraining from making that concession would have resulted in a different outcome at Miguel's trial under Strickland. Accordingly, Miguel is not entitled to federal habeas corpus relief for ground 5(A).

### 5.    Ground 5(B)—Concession that Miguel and A.B. Had an Agreement.

Miguel asserts that trial counsel provided ineffective assistance by conceding that A.B. and Miguel had "an agreement" to "make some money" through A.B.'s acts of prostitution in Las Vegas. (ECF No. 4 at 17.) However, counsel's remarks in the context of counsel's closing argument, cannot be reasonably construed as a concession that Miguel and A.B. had an agreement to share in her earnings as a prostitute as it is clear that counsel used a summary of A.B.'s testimony to set the table for his argument urging the jury to find the State failed to prove Miguel agreed to, or shared, A.B.'s intentions to prostitute for money in Las Vegas.

In closing arguments, defense counsel argued Miguel was "not guilty" of the charges "under any theory" that the State presented. (Id. at 66.) Defense counsel also argued the State failed to prove that, at the time Miguel drove A.B. to Las Vegas, he possessed the required specific intent "to induce, persuade, encourage, inveigle, entice or compel [A.B.] to become a prostitute or to continue to engage in prostitution" and explained that the specific intent required for conviction of Pandering by Providing Transportation required more than simply knowing someone is a prostitute and taking them someplace:

> . . . just moving someone knowing that they're a prostitute is not enough to convict them of pandering by providing transportation. . . . He has to intend one of these results before—he has to provide the transportation with the intent to induce, persuade, encourage, inveigle, entice, or compel that person to become a prostitute or to continue to engage in prostitution.

(ECF No. 13-2 at 64.)

In closing remarks, trial counsel summarized A.B.'s testimony about her understanding of the purpose of her trip to Las Vegas, and then remarked, "that was the testimony." See text, supra, at 16–17. Counsel then argued that A.B.'s testimony proved she "made up her mind" to go to Las Vegas to make money as a prostitute before Miguel drove her to Las Vegas but his providing transportation did not prove he shared her intentions:

> She had her grandfather bring her to his place so that they could go to Las Vegas. At that point, ladies and gentlemen, if there was any induction—which we've already gone over; there wasn't. But any of these verbs would have already been done. She has made up her mind that that's what she's going to do. So providing transportation was not with the specific intent to induce, even though we can agree that the providing transportation happened. They had an agreement; that's all. There wasn't any persuasion, compulsion, any of that type of stuff. It was an asked and answered situation. Did the transportation take place? Yes. Does it fit under the definition of this crime? No . . .

(ECF No. 13-2 at 65.)

Considered in context, trial counsel's closing argument did not fall below an objective standard of reasonableness. Counsel's argument cannot be reasonably construed as a concession that Miguel and A.B. had an agreement to share in her earnings as a prostitute or as having relieved the State of its burden to present admissible evidence of guilt beyond a reasonable doubt for the specific intent and other elements necessary to prove Pandering by Furnishing Transportation. The state appellate court reasonably determined Miguel failed to demonstrate counsel performed deficiently under Strickland. Miguel is not entitled to federal habeas corpus relief for Ground 5(B).

## C.    Consideration of Counsel's Conduct as a Whole

The Court notes that, although IAC claims are examined separately to determine whether counsel was deficient, Strickland instructs that the purpose of the Sixth Amendment's guarantee to counsel "is simply to ensure that criminal defendants receive a fair trial" and "that a defendant has the assistance necessary to justify reliance on the outcome of the proceeding." The performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances." Strickland, 466 U.S. at 688 (emphasis added); see, e.g., Boyde, 404 F.3d at 1176

("prejudice may result from the cumulative impact of multiple deficiencies.") (quoting Cooper v. Fitzharris, 586 F.2d 1325, 1333 (9th Cir. 1978)). In Browning v. Baker, 875 F.3d 444 (9th Cir. 2017), the Ninth Circuit Court of Appeals held, "[w]hile an individual claiming IAC 'must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment,'" the court "considers counsel's conduct as a whole to determine whether it was constitutionally adequate." Id. On consideration of the merits of Miguel's IAC claims as a whole, the Court concludes Miguel does not show that, on the whole trial counsel's actions or omissions were deficient and prejudicial. Accordingly, the Court further finds that Miguel does not demonstrate that he received constitutionally inadequate assistance from counsel denying him due process or a fair trial.

## V.   **CERTIFICATE OF APPEALABILITY**

This is a final order adverse to Miguel. Rule 11 of the Rules Governing Section 2254 Cases requires this Court to issue or deny a certificate of appealability ("COA"). This Court therefore has sua sponte evaluated the claims within the petition for suitability for the issuance of a COA. See 28 U.S.C. § 2253(c); Turner v. Calderon, 281 F.3d 851, 864–65 (9th Cir. 2002). "To obtain a COA under § 2253(c), a habeas prisoner must make a substantial showing of the denial of a constitutional right," and for claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000) (citing Barefoot v. Estelle, 463 U.S. 880, 893 & n.4 (1983)). For procedural rulings, a COA will issue if reasonable jurists could debate (1) whether the petition states a valid claim of the denial of a constitutional right; and (2) whether this Court's procedural ruling was correct. See id. Applying this standard, a certificate of appealability is not warranted for any of the Grounds of the Petition. See Slack, 529 U.S. at 484.

## VI.   **CONCLUSION**

**IT IS THEREFORE ORDERED** that Petition (ECF No. 4) is **DENIED** in its entirety.

**IT IS FURTHER ORDERED** that a Certificate of Appealability is denied as to all grounds. Reasonable jurists would not find the Court's rejection of Ground 2, or the remaining claims addressed in this Order for Ground 5 debatable or wrong. Reasonable jurists would not find

it debatable whether this Court is correct in its procedural rulings that Grounds 1, 3, 4, and 6 were unexhausted or that Ground 5 was partially unexhausted, for the reasons stated in ECF No. 29.[7]

      **IT IS FURTHER ORDERED** that the Clerk shall enter judgment and close this case.

DATED: January 22, 2025.

_____
RICHARD F. BOULWARE, II
UNITED STATES DISTRICT JUDGE

---

[7] The Court granted Petitioner's motion to dismiss Grounds 1, 3, 4, 6, and the portion of Ground 5 that the Court determined was unexhausted. (ECF Nos. 29–32.)